UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DAVID R. HUNT                                                                                    PLAINTIFF

v.                                                                       CIVIL ACTION NO. 3:13-CV-976-DW

CAROLYN COLVIN,
COMMISSIONER OF SOCIAL SECURITY                                                  DEFENDANT

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff David Hunt has filed a complaint pursuant to 42 U.S.C. §405(g)  to obtain

judicial review of a final decision of the Commissioner of Social Security that denied his

applications for disability insurance benefits (DIB) and supplemental security income (SSI).

Hunt applied for DIB and SSI on May 8, 2010, alleging that he was disabled as of March 6,

2009, due to attention deficit disorder, psychological instability and social workplace problems

(Tr. 122).  The Commissioner denied Hunt's claims on initial consideration (Tr. 55-56) and on

reconsideration (Tr. 57-58).  Hunt requested a hearing before an Administrative Law Judge

(ALJ) (Tr. 102).

ALJ D. Lyndell Pickett conducted a hearing in Louisville, Kentucky, on Jan. 12, 2012

(Tr. 36-54).  Hunt attended with his attorney, Alvin Wax (Tr. 36).  Hunt and vocational expert

(VE) Stephanie Barnes testified at the hearing (Tr. 40-51, 52-54).  Following the conclusion of

the hearing, ALJ Pickett entered a hearing decision on April 6, 2012, that found Hunt is not

disabled for the purposes of the Social Security Act (Tr. 20-31).

In his adverse decision, ALJ Pickett made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act
        through March 31, 2014.

2.      The claimant has not engaged in substantial gainful activity since March 6, 2009,
        the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq.*).

3.	The claimant has the following severe impairments: depressive disorder and diabetes mellitus (20 C.F.R. 404.1520(c) and 416.920(c)).

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.	After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except limited to occasional climbing of ladders, ropes and scaffolds, can occasionally crawl, limited to frequent but not constant climbing of ramps and stairs, can frequently stoop, kneel, crouch, or crawl, only occasional exposure to vibration, work should be routine, repetitive, and unskilled, generally considered low stress, no strict production quotas, work should be away from the general public, only occasional contact with co-workers and supervisors, and work should be in a task oriented environment.

6.	The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.	The claimant was born on Nov. 23, 1954, and was 54-years-old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  The claimant subsequently changed age category to advanced age (20 C.F.R. 404.1563 and 416.963).

8.	The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.	Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, App. 2).

10.	Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11.	The claimant has not been under a disability, as defined in the Social Security Act, from March 6, 2009, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 22-31). Hunt sought review of the hearing decision by the Appeals Council (Tr. 15-16). The Appeals Council denied his request for review, finding no reason under the Rules to review ALJ Pickett's decision (Tr. 1-6). The present lawsuit followed.

**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See, 20 CFR §§ 404.1505, 416.905(a). To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed. 20 CFR §§ 404.1520, 916.920(a). At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled. See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971. *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities. See 20 CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2. *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the

listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989). A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3) The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the

Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**The Material Facts.**

David R. Hunt was born Nov. 23, 1954, and was 54 years old at the time of ALJ Pickett's adverse decision (Tr. 30, 40). He is 5'8" tall and weighs 225 lbs. (Tr. 40). Hunt has never

married and has no dependents (Tr. 40). He is a college graduate with a master's degree in computer engineering from the U of L Speed School of Engineering (Tr. 40, 186). He also has a Microsoft software and Visual Studio certification from Sullivan University (Tr. 186).

For approximately 15 years, Hunt worked in Michigan as an independent computer programming consultant for various employers from 1986 until 2001 (Tr. 239, 249). Hunt returned to Louisville, Kentucky, after downsizing in the automobile industry made it impossible for him to obtain employment as a computer programmer consultant in Michigan (Tr. 249). Upon returning to Louisville, where his family lived, Hunt worked a number of entry level jobs that included employment as a clerk in a retail store, a clerk at a liquor store, a temporary warehouse worker, a gas station attendant, restaurant employee, and telemarketer (Tr. 131). Hunt has not worked since March of 2009 (Tr 131), although he continued to seek employment without success throughout the time that he was applying for disability (Tr. 140, 212, 256, 296).

When asked at the hearing what problems prevented him from sustaining employment, Hunt explained that he has difficulty with understanding verbal communications, multi-tasking and communicating with others at work (Tr. 41-46). Hunt's prior employers, according to the vocation evaluation report prepared by vocational rehabilitation specialist Andrea Weahrley (Tr. 174-187), indicate that Hunt's main problem areas in employment include "hygiene, multi-tasking, being argumentative and following directions." (Tr. 185). Hunt's parents on a number of occasions have informed different healthcare providers and evaluators that Hunt has difficulties with social interaction and understanding verbal information (Tr. 185, 215, 238, 249, 254).

Hunt has a limited medical history that includes treatment for diabetes mellitus and hypertension (Tr. 42, 269-287). Hunt also beginning June 30, 2011, started treatment with the University of Louisville Psychiatric Group for major depressive disorder (Tr. 253-260, 268, 296-

6

302).  Hunt's family has a history of bipolar disorder found in both his sister and his biological

mother, who was reported to have attempted suicide on multiple occasions (Tr. 249-59).  Hunt,

however, has no prior mental health treatment history outside of a brief hospitalization in 2007,

following a panic attack and his recent treatment by the U of L Psychiatric Group (Tr. 253-60,

268, 296-302).  Hunt had not previously been treated with psychotropic medication, either, for

his mental problems.

A number of consultative examiners, healthcare providers and vocational professionals

have examined Hunt.  Dr. D. Keshore Gupta, a psychiatrist/neurologist, performed a consultative

psychological evaluation of Hunt on June 15, 2010 (Tr. 210-212).  Upon examination, Dr. Gupta

diagnosed major depression (Tr. 211).  Dr. Gupta noted Hunt's affect to be depressed with a poor

degree of autonomy (Tr. 211).  Hunt was noted to be fully oriented to time, place and person, to

have successfully completed a 3-object memory test and to be able to do serial 7's subtraction

and abstract thinking (Id.).  Hunt reported to Gupta on that occasion that his social interactions

with friends and family were "okay," but that he had no motivation to do anything except keep

looking for work (Id.).

Dr. Gupta advised Hunt that he should be examined by a psychiatrist and treated with

antidepressant medication such as Zoloft (Tr. 212).  Otherwise, Dr. Gupta concluded that Hunt is

able to remember, understand or carry out instructions; he is able to relate to co-workers; and he

is able to concentrate, sustain persistent and pace and adapt.  Dr. Gupta considered Hunt's

prognosis to be good, although the doctor assessed Hunt with a current GAF of 40 (Tr. 211-12).

The following week after Dr. Gupta's examination, Hunt underwent a

neuropsychological evaluation on June 22, 2010, performed by Adam Brickler, Psy.D., a

licensed clinical psychologist (Tr. 213-18).  Dr. Brickler conducted a clinical interview and

administered a battery of psychological tests (i.e., WAIS-IV, NAART, BNT, MCVT, WCST,

MAS, ISV, MMPI-II).  Dr. Brickler concluded that his neuropsychological evaluation of Hunt revealed "evidence of diminished cognitive functioning."  (Tr. 213).  Hunt exhibited mild difficulties with attention, concentration and verbal memory.  Given Hunt's intellectual abilities, Dr. Brickler considered his intellectual ability and attention skills to be "significantly diminished." Dr. Brickler diagnosed attention deficient/hyperactivity disorder, not otherwise specified."  (Id.).

The doctor also noted that Hunt's personal history of having few friends, no intimate relationships and difficulty with social interactions in a work setting, along with his inappropriate laughing, suggested to the doctor the presence of dyssemia (the absence of social skills, thought to be the result of a right frontoparietal dysfunction) (Id.).  Dr. Brickler observed in his report that:

> One would assume that in a work setting, the subject's mild inattention, coupled with difficulties understanding the subtleties of communication with his co-workers and superiors, has made it difficult to function successfully.

(Tr. 214).

Nevertheless, Hunt's intelligence test results revealed a full scale IQ of 117 with high average verbal abilities and superior visuospatial abilities, which indicated to the doctor that Hunt's intellectual potential was in the high average to superior range (Tr. 214).  The doctor concluded that Hunt might benefit from referral to a vocational or career services center to improve his work-related interpersonal skills (Id.).

Hunt's father and stepmother also attended this evaluation (Tr. 215).  Hunt's father advised Dr. Brickler that his son had trouble maintaining even low level jobs due to problems following verbal instructions and difficulty with social interaction (Id.).  These problems, according to the father, led to Hunt being laid off or fired from his jobs as gas station attendant,

stock clerk and McDonald's employee.  Hunt's stepmother indicated that he had difficulties completing tasks that most individuals do every day such as grooming and personal hygiene (Id.).  She further reported that her stepson had developed significant anxiety due to his difficulty in coping with independent living, which led to hospitalization for a panic attack (id.).  Hunt at that time was being financially supported by his family.

Hunt reported no prior significant personal relationships and expressed no desire to develop such a relationship (Tr. 215).   Dr. Brickler noted that Hunt's general appearance was "slightly odd" and that he was wearing "somewhat soiled shorts with long black socks."  (Tr. 216).  Hunt also was noted to laugh at inopportune and strange moments and that his speech was mildly verbose.  Nevertheless, Hunt had no difficulty relating his personal history and was fully oriented with good concentration and generally euthymic mood, but with limited insight into his difficulties (Tr. 216).  Results on the Minnesota Multiphasic Personality Inventory-II indicated social introversion, shyness, insecurity, social withdrawal, diminished self-confidence, and avoidance of interaction with others (Tr. 218).

 Otherwise, Hunt reported no significant emotional distress, believed that he was happy most of the time, and acknowledged no concerns about his physical health, memory or judgment (Id.).  He was noted to have low average to superior range verbal skills; borderline to average attention and concentration; and low average to very superior verbal and visual memory domain scores (Tr. 217-18).

On Aug. 10, 2010, at the request of Hunt's counsel, Dr. Jack Teeple, also a licensed clinical psychologist performed a psychological evaluation of Hunt (Tr. 238-241).  Dr. Teeple concluded that while Hunt's prior test scores indicated an intelligent individual who had obtained an advanced degree with intelligence in the bright average to superior range, the deficits in Hunt's psychological and social functioning offset these advantages so as to render him unable to

hold full-time employment, a fact confirmed by Hunt's numerous unsuccessful entry-level jobs (Tr. 240). Dr. Teeple concluded that psychological testing alone did not adequately portray these deficits (Tr. 240).

Dr. Teeple concurred with Dr. Brickler's report that dyssemia was a good description of Hunt's symptoms for individuals who do not pick up on the social meaning of nonverbal communication and cannot read social mannerisms, facial expressions, gestures and other cues that convey meaning to most other individuals (Tr. 240). Accordingly, Dr. Teeple concluded that he felt Hunt "cannot now hold any full-time employment in a competitive job market and that his disorder continues [to be] a functional disability for him." (Tr. 241). Dr. Teeple, upon requesting services for Hunt at the Systemic Treatment for Autism and Related Disorders (STAR) Program at the Weisskopf Center, indicated that he considered Hunt to have autism spectrum disorder that overlapped a nonverbal learning disorder (Tr. 249).

Dr. Eva Markham, an associate professor of pediatrics and a licensed psychologist employed at the Weisskopf Child Evaluation Center, performed a psychological evaluation of Hunt on two occasions in March of 2011 (Tr. 248, 252).Dr. Markham in her report reviewed the prior psychological evaluations prepared by Dr. Brickler and Dr. Teeple, along with an evaluation prepared by the STAR staff, which had recommended that Hunt undergo individual therapy to address his life and social skills (Tr. 248-49). Hunt's parents also accompanied him to the Evaluation Center, where they reported to Dr. Markham that Hunt essentially was homeless and living in the basement of his brother-in-law's home with no income and only a small amount of food stamps (Tr. 249). According to Dr. Markham, Hunt's parents described "a harsher reality regarding work and general issues in living, which Mr. Hunt tended to minimize." (Id.).

Dr. Markham on mental status examination noted that Hunt appeared to be groomed adequately on the two occasions she met with him, although very poor personal hygiene and

grooming had been reported by his father and stepmother to be difficult for him (Tr. 250). Hunt was noted to be cooperative, but his affect appeared inappropriate such as when he laughed after his father mentioned that his now-deceased biological mother had attempted suicide 10 times. Dr. Markham observed that "Overall, Mr. Hunt's affect was probably entirely too cheery for an individual who is essentially homeless, destitute and unable to maintain employment." (Id.). Hunt appeared to the doctor to have little insight into how his obsessive behavior, i.e., keeping moldy shoes and spoiled food, might be seen as a sign of mental illness by others. Hunt exhibited a lack of concern with his financial situation, his inability to obtain employment and the perception of his family members that he was not doing well. Nevertheless, Dr. Markham noted that given his measured cognitive abilities, he had more than adequate intellect and did not appear to have deficits in attention or any problems with distractibility, impulse control or other behavioral variables (Id.).

Dr. Markham, contrary to other evaluators, concluded that "Mr. Hunt clearly does not have an autism spectrum disorder such as Asperger disorder." (Id.). She also concluded that Hunt clearly did not have a nonverbal learning disability (Tr. 251). Dr. Markham made no diagnosis of Hunt on Axis I, but did concluded that Hunt appeared to exhibit the symptoms of a schizoid personality disorder. Such individuals, as Dr. Markham noted in her report, do not desire or enjoy close relationships, choose solitary activities, have little interest in sexual interaction, take pleasure in few activities, lack close friends or confidants and show emotional coldness, detachment or flat affect (Id.).

Dr. Markham noted on Axis IV that Hunt had problems with social environment, occupation, housing and economics. In other words, he had no friends, had been unemployed long-term, was homeless and destitute (Id.). Dr. Markham's GAF assessment score was 40, indicating major impairment in work, judgment, social interaction and life as an independent

adult (Id.).  Accordingly, the doctor concluded that Hunt's "functioning, however, is so impaired this time that it is likely that he will not succeed in securing and maintaining appropriate employment." (Tr. 252).  The doctor concluded that Hunt should continue to pursue his application for disability and consider psychoeducational therapy (Id.).

On Feb. 21, 2012, Dr. Gary Maryman, a licensed clinical psychologist, performed a consultative psychological evaluation of Hunt (Tr. 288-292).  Hunt on that occasion reported to Dr. Maryman that he had trouble verbally comprehending what others said to him, which had led to Hunt being fired from several jobs.  Hunt described himself on that occasion as being an introvert (Tr. 288).  Upon examination, Hunt appeared to Dr. Maryman be fully oriented and showed no signs of emotional distress (Tr. 289).  He was noted to relate very well, was quite friendly and polite, provided good eye contract and conducted himself appropriately with "pretty well developed social skills." (Tr. 289).

 Dr. Maryman noted that Hunt put forth good effort on testing, displayed good focus, concentration and persistence, and seemed to maintain a good mood throughout the examination (Id.).  Dr. Maryman concluded that testing gave very little indication that Hunt had suffered any degree of cognitive decline.  Hunt, for his part, indicated that he thought that he got along "pretty well with others," although he had "slight problems at times," but otherwise had "pretty good relations with co-workers and supervisors." (Id.).  Hunt did not mention depression or anxiety, although Dr. Maryman did note a "hint of depression at times." (Id.).

Hunt reported that he spent a great deal of his time reading at the public library (Tr. 290).  He reported being able to do his own grocery shopping, laundry, and drive an automobile (Id.)..  Hunt indicated he did have a good friend, Eric, with whom he watched movies and listened to music.  Hunt reported visiting his father and stepmother about once a week.

Dr. Maryman administered the WAIS-IV and WRAT-4 tests which indicated a full-scale IQ of 111, placing Hunt's intelligence toward the upper end of the average range (Tr. 290). Hunt's reading level upon testing also fell within the average range, although Dr. Maryman noted that it could have been somewhat higher given Hunt's educational history. Ultimately, Dr. Maryman concluded that Hunt retained the intellectual ability to understand, retain and carry out simple to somewhat complicated instructions (Tr. 291). The doctor also concluded that Hunt would be able to carry out work assignments reasonably well on a routine work schedule and that he would be able to interact appropriately with fellow workers and supervisors with some "slight limitation for him in dealing with the general public." (Id.). The doctor also concluded that Hunt would be able to adjust and adapt reasonably well to stresses and pressures in the workplace. Accordingly, Dr. Maryman diagnosed Hunt with depressive disorder with a current GAF score of 60 (Tr. 292).

Dr Maryman also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. 293-94). The Source Statement indicates that Hunt has no marked (serious) or extreme (major) mental limitations, and is only moderately (more than slightly) limited in his ability to make judgments on complex work-related decisions, and interact appropriately with the public, his supervisors, and co-workers. (Id.). Dr. Maryman found that Hunt has no limitations in his ability to understand, remember and carry out simple instructions, or in his ability to make judgments on simple work-related decisions. (Id.)

Hunt received cognitive behavioral therapy from July of 2011, through May of 2012, from George Cartwright, a licensed clinical social worker (LCSW) working with the University of Louisville Psychiatric Group (Tr. 296-302). Treatment notes reflect that Hunt reported to Cartwright that he wanted to return to working in the IT field, but had not worked since 2001, and was "trying to get disability…." (Tr. 296). Hunt reported to the therapist that he forgets

easily and misses social cues. Cartwright noted Hunt's behavior to be mildly agitated with his speech slow/latent and mood irritable with impaired judgment (Id.). Treatment notes reflect a diagnosis of major depression throughout Hunt's counseling (Tr. 296-302).

Hunt on his return visit to Cartwright two weeks later reported that he still wanted to find work (Tr. 297). Hunt's father and stepmother accompanied him on the next visit on Aug. 16, 2011, and shared their views that Hunt is "argumentative, [has] trouble following simple directions, trouble with other employees, and especially with his hygiene" (Tr. 298). Cartwright noted Hunt's mood to be dysphoric, behavior agitated, affect constricted, insight poor and judgment impaired (Id.).

Hunt subsequently reported conflicted feelings to Cartwright about Hunt's disability claim versus work. According to the treatment notes of Sept. 1, 2011, Hunt told Cartwright that Hunt could work "but doesn't feel he has a way to get a job." (Tr. 299). Hunt then proceeded to blame his stepmother, brother-in-law and former school for his situation. His appearance on that occasion was noted to be fair-to-poor with agitated behavior, pressured speech, dysphoric mood, constricted affect and poor insight (Id.). Hunt's diagnosis of major depression remained unchanged.

On Oct. 13, 2011, Hunt reported to Cartwright that he was having a "bad time of it all" and that people around him were in financial problems (Tr. 300). Hunt's appearance, behavior, mood, affect, insight and judgment remained unchanged from the prior therapy session of Sept. 1, 2011 (Id.). As late as Dec. 15, 2011, the month prior to Hunt's scheduled disability hearing, Hunt reported to Cartwright that he was still looking for employment with Geek Squad (Tr. 301). Hunt also voiced an interest in job counseling through vocational rehabilitation (Id.). Cartwright's diagnostic impression remained unchanged - - major depression.

Hunt did not return for further therapy from Cartwright until five months later on May 31, 2012 (Tr. 302). On that occasion, Cartwright discussed with Hunt's parents the issues "that impaired [Hunt from] getting a job." (Id.). After discussing the differences between behavioral therapy and vocational counseling, Hunt advised that he wished to pursue his disability claim (Tr. 302).

Hunt's father, Roger Hunt, completed a third party function report on Aug. 7, 2010 (Tr. 165-173). Mr. Hunt reported that his son was then homeless, living in his sister's basement temporarily, with his sole income being food stamps (Tr. 166). Hunt's father reported that Hunt has problems with his personal care, which include wearing the same clothes for weeks at a time, or wearing clothes not appropriate for his age (Tr. 167). Mr. Hunt also related that his son does not bathe often enough and has noticeable body odor. His hair is long and unkempt as is his beard, which is frequently untrimmed (Tr. 167).

Mr. Hunt reported that his son remains able to do household chores, inside and outside, but does not do so. He reported his son also is able to shop for food and toiletries regularly and that his son spends significant time reading, watching DVDs and being online on the computer (Tr. 169-70). Hunt's father reported that Hunt does have one good friend with whom he watches movies and DVDs about once a week. Hunt also reported that his son visits Mr. Hunt or his sister weekly and that he also goes to the library regularly (Tr. 170).

Mr. Hunt related that his son had been fired from several jobs since returning to Kentucky due to his friction with both supervisors and co-workers (Tr. 171). As Mr. Hunt described the problem, his son "tends to argue with supervisors over his inability to perform assigned tasks, which led to Hunt being fired from his job at a gas station/convenient store. After being discharged, Hunt was hospitalized briefly for a panic attack.

Hunt's father reported that Hunt had problems beginning in grade school and was treated by a child psychologist (Tr. 172). These problems included continual rocking, talking loudly, dyslexia, obsessive/compulsive behaviors, indifference to grooming, which Mr. Hunt concluded were the result of his son's childhood behavioral development problems that he never overcame (Tr. 172-73). Mr. Hunt reported that his son was unemployable, had been fired repeatedly from part-time jobs over the past years within a few months of being employed due to his problems with hygiene, grooming and his inability to form "normal connections with people." (Tr. 173).

As noted, vocational evaluator Andrea Wehrley prepared an extensive vocational evaluation report of Hunt (Tr. 174-187). Hunt had been referred to Wehrley by the Dept. of Vocational Rehabilitation to identify appropriate employment options (Tr. 174). He was noted to be accompanied by his stepmother and father, who provided additional information during the interview. The evaluation report notes that Hunt had been recently diagnosed with diabetes and had occasional moderate back pain since 2007, when he injured his back lifting packages at UPS (Id.).

Wehrley noted in her report that Hunt had undergone two psychological assessments, one of which indicated that he may have Asperger's symptoms, and another evaluation which indicated Hunt is a high-functioning autistic (Tr. 175). Hunt's parents reported that he had temporarily held numerous jobs since 2002, and had been fired from most of them within a matter of months. Hunt's stepmother advised Wehrley that she had contacted several of Hunt's former employers to ask why her stepson had been fired. His manager at McDonald's restaurant indicated that Hunt was argumentative and that several co-workers had complained about his hygiene (Tr. 175). Although Hunt had been given the easiest job available at McDonald's, running the drive-through, the manager had advised that Hunt could not even handle this simple job. Likewise, the manager at Speedway gas station told Hunt's stepmother that Hunt's hygiene

was a "top complaint." (Id.). Also, the manager advised that Hunt could not multitask and that there would be long lines of customers waiting to be checked out. Both of Hunt's parents indicated that he had difficult relating to other people and working with them, as well as trouble comprehending verbal instructions. Hunt confirmed this with Wehrley, whom he told that he might have auditory dyslexia, which he felt interfered with his employment in the past, particularly in working in restaurant settings with multiple people (Tr. 175).

At the time of the evaluation Hunt was homeless. Hunt related his educational history, which included a Master's degree in computer engineering, as well as a certification in Microsoft and Visual Studio software (Tr. 176). Wehrley noted that despite past employers' complaints concerning Hunt's hygiene, he appeared for the evalution neatly dressed and his hair appeared to have been combed, but when Hunt returned the next day, Wehrley noted that he appeared to be wearing the exact same clothes from the day before. Wehrley also reported that she noticed a "faint sour smell" coming from Hunt "similar to the smell of clothes that have been sitting in water for too long." (Tr. 177).

. During the interview, Hunt did not make eye contact with Wehrley or with his parents, and when talking, he tended to stare past people or look away altogether (Tr. 177).Wehrley also noted that Hunt was argumentative when his stepmother described the reasons that he was fired from McDonald's and Speedway (Id.). Wehrley noted that Hunt had a tendency to ramble on about particular topics and to lose sight of the original subject of conversation. His though process seemed incongruent and tangential so that he had difficulty making cause and effect connections (Id.). For example, Hunt had difficulty in explaining why he could not hold a job (Id.).Wehrley concluded that Hunt's interpersonal behavior, self-direction, work tolerance and self-care were barriers to employment with his diagnosed autistic symptoms "playing a part in his inability to find and maintain employment." (Tr. 178).

Wehrley administered a battery of vocational and personality tests to Hunt (Tr. 179-184). These tests included the Career Ability Placement Survey (CAPS), the Campbell Interest and Skill Survey (CISS), the Jackson Vocational Interest Survey (JVIS), the Myers-Briggs Type Indicator (MBTI), and Career Exploration Exercise (CEE) (Tr. 179-184). Hunt obtained low verbal reasoning and low perceptional speed and accuracy scores on the CAPS, indicating he would have difficulty understanding concepts expressed in words and difficulty perceiving small details rapidly and accurately (Tr. 180). Otherwise, his scores on the CAPS were average with Wehrley indicating his test scores showed that Hunt would perform best with jobs involving written rather than verbal communication (Tr. 180).

Hunt's scores on the CISS indicated very low interest and low skill for confidence in extraversion required in work environments that involve a great deal of personal contact with others (Tr. 180). His JVIS results revealed a strong preference for math and science related jobs (Tr. 181-82). The personality scores from the MBTI revealed Hunt to have an introverted personality that avoids conflict that is solitary and shy (Tr. 183). Hunt on the CEE indicated that he desired to acquire full-time work so that he could become self-supporting (Tr. 183). Wehrley concluded that Hunt would need to pursue part-time light duty initially in a position that he can work by himself (Tr. 184).

Wehrley noted several areas of concern such as hygiene, multitasking, being argumentative and following directions. Due to Hunt's history of failed work, Wehrley concluded that supported employment with an employment specialist who would work directly with Hunt to overcome these problems would be the best alternative (Tr. 185). Wehrley also recommended a specific grooming/bathing routine for Hunt with training in basic communication strategies and practice of interpersonal skills (Tr. 185). Wehrley recommended

that an employment specialist shadow Hunt for at least the first several days of any future employment to observe his behaviors (Tr. 185).

Given Hunt's defensiveness during the intake interview and his refusal to complete the categories of "skills for improvement" and "personal areas for growth and development," Wehrley concluded that Hunt may not be aware of the role his own behaviors have played in his unsuccessful employment attempts.  Accordingly, Wehrley recommended counseling for Hunt so that he could "make the changes necessary to maintain employment."  (Tr. 186).  Wehrley also recommended that Hunt participate in an autism support group and undergo a formal auditory processing assessment (Tr. 187).

On June 30, 2011, Hunt appeared for psychiatric assessment by Dr. Steven Lippmann of the University of Louisville Psychiatric Group (Tr. 257-258).  Hunt had been referred to the U of L Psychiatric Group by Vocational Rehabilitation.  Treatment notes of Dr. Lippmann reflect a "long record of low performance, poor job record, [and] social dysfunction."  (Tr. 257).  Treatment notes reflect that Hunt had been examined at the Weisskopf Child Evaluation Center for autism and/or Asperger's, but had been diagnosed with schizophrenia (Id.).  As a child, Hunt had been diagnosed with ADD, anxiety and obsessive/compulsive behaviors, and had experienced hospitalization for a panic attack in 2008.  Dr. Lippmann noted that Hunt was unable to relate to people and unable to keep a job (Tr. 258).  Hunt's social history, according to the doctor, included lifelong inability to socially relate, lifelong job problems in the past decade, and lifelong personal judgment problems (Tr. 259).

Dr. Lippmann's mental status examination of Hunt revealed Hunt's memory and cognitive abilities to be within normal limits, as well as this thought process (Tr. 260).  Hunt exhibited normal behavior mannerisms, good cooperation with the doctor and had fluent, well-spoken speech (Id.).  His judgment and insight, however, were both noted to be "extremely poor"

as was his self-care, dressing and hygiene (Id.). Depression criteria were noted to include feelings of worthlessness and diminished concentration. (Id.).

When Hunt returned to the UL Psychiatric Group on July 19, 2011, he reported to social worker George Cartwright that he still wanted to work, but was exploring the possibility of obtaining disability (Tr. 256). Dr. Lippmann on Aug. 1, 2011, diagnosed Hunt with pervasive development disorder and assigned a GAF score of 30, but did not prescribe any medication for Hunt's mental condition (Tr. 255). Dr. Lippmann recommended cognitive behavioral therapy instead. Once again, Hunt's behavior was appropriate, his memory intact, his speech normal, his affect appropriate, and his mood euthymic (Id.). Dr. Lippmann, however, noted Hunt's insight to be poor and his judgment impaired and concluded that Hunt had "low function" on Axis IV of the DSM-IV (Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed. 1994), an Axis used to evaluate psychosocial and environmental problems that potentially may affect the diagnosis, treatment and prognosis of a mental disorder.


**Legal Analysis.**

Hunt in his fact and law summary objects to findings of fact 4, 5, 9, 10 and 11 of ALJ Pickett's hearing decision of April 6, 2012 (Tr. 20-30) (DN 12). The primary thrust of Hunt's arguments, however, is contained in his objections to findings of fact 4 and 5, which are incorporated by reference into his objections to the remaining findings 9, 10 and 11 (DN 12, p. 13). ALJ Pickett in finding no. 4 determined that Hunt does not have an impairment or combination of impairments that meet or equal the severity of any of the listed impairments of 20 C.F.R. Part 404, Subpart P, App. 1 (Tr. 23-24). In finding no. 5, ALJ Pickett determined that Hunt retains the original functional capacity (RFC) to perform medium work of a routine, repetitive, unskilled and low stress nature with no strict production quotas performed away from

the general public with only occasional contact with co-workers and supervisors in a task oriented environment (Tr. 24-25). Hunt now insists that these two findings are not only unsupported by substantial evidence, but are contrary to overwhelming evidence of disability in his case.

Hunt argues specifically that the psychiatric review technique (PRT) findings of the ALJ at pp. 4-5 of the opinion (Tr. 23-24), are not supported by substantial evidence. In fact, Hunt maintains that the ALJ failed to consider the record as a whole when finding that Hunt had only moderate difficulty in the areas of concentration, persistence or pace (DN 12, p. 2). In particular, Hunt maintains that the ALJ extracted only a small excerpt of the report of Dr. Markham that indicated Hunt did not appear to have deficits in attention or difficulty with distractibility (Tr. 24, 248-252). Hunt insists that Dr. Markham evaluated far more than merely his concentration and made significant findings with respect to Hunt's limited activities of daily living and social functioning that the ALJ failed to consider. This "dissonance," as Hunt describes the difference between Dr. Markham's whole report and the limited findings of the ALJ, according to Hunt, is underscored by Dr. Markham's conclusion that Hunt's functioning "is so impaired at this time that it is likely he will not succeed in securing and maintaining appropriate employment." (Tr. 252).

The Commissioner in her fact and law summary points out in response that Hunt in challenging finding no. 4 does not appear to argue that his mental impairments meet or equal any particular listed impairment (DN 15, pp. 3-4). Rather, Hunt focuses solely on the PRT findings, which the Commissioner insists are supported by substantial evidence that Hunt at most has only moderate limitations in his activities of daily living, social functioning and maintaining concentration, persistence or pace (Tr. 23-24). The Commissioner contends in this respect that ALJ Pickett did not rely exclusively on the consultative examination results obtained by Dr. Eva

Markham to support his PRT findings. ALJ Pickett instead cited to a number of exhibits in the record including exhibits 1F, 2F, 5F, 8F, 9F and 13 F as support for finding of fact no. 4. (Tr. 165-73, 210-19, 238-41, 248-60, 269-95).

The Commissioner adds that ALJ Pickett's decision to accord Dr. Markham's opinion only limited weight was appropriate because the doctor's opinion relied heavily on subjective reports from Hunt's father and stepmother, whereas Hunt's own employment record established that he had been able to maintain employment over substantial periods of time and had significant earnings (Tr. 29,115-19, 123). Finally, the Commissioner concludes on this issue that Dr. Markham's opinion about whether Hunt can obtain or maintain employment is an opinion reserved exclusively to the Commissioner which is entitled to no special significance much less controlling weight. 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p, 1996 WL 374183 at *3 (SSA).

Hunt in his objection to finding no. 5 focuses on that portion of the RFC that finds that he is capable of performing routine, repetitive and unskilled work generally considered to be low stress, with no strict production quotas, away from the general public with only occasional contact with co-workers and supervisors in a task oriented environment (Tr. 24-25). Once again, Hunt insists that ALJ Pickett in making this portion of his RFC finding did not consider the record as a whole, particularly those substantial portions of the record that are directly contrary to the finding.

Most importantly, Hunt points out that ALJ Pickett made absolutely no mention of the vocation evaluation report of Nov. 12, 2010, prepared by Andrea Wehrley of Jewish Family and Career Services (Tr. 174-187). While Wehrley, a vocational specialist, is not an "acceptable medical source," Hunt maintains that the report nevertheless must still be considered in the ALJ's evaluation of the intensity, persistence and limiting effects of Hunt's mental symptoms to

determine their full effect on his functioning (DN 12, p. 3). Thus, by completely omitting from his hearing decision any mention of Wehrley's vocational evaluation whatsoever, the ALJ failed in his duty to consider the record as a whole.

Hunt insists that this omission was "not an insignificant error." (Id.). The report, Hunt notes, was based on two separate interviews and included objective vocational testing which produced results that according to Hunt directly conflict with the conclusions of the ALJ regarding Hunt's ability to function in a work environment. For example, Hunt points out that Wehrley's vocational evaluation report finds that Hunt has problems with his hygiene, multitasking, following directions and being argumentative (Tr. 185). These problems were so significant Hunt notes that Wehrely recommended Hunt be provided with supported employment with a specialist to "shadow" him to observe his behaviors and suggest corrections (Id.). Further, Wehrley's own observations independently confirm Hunt's hygiene problems with Wehrley noting that Hunt had a "faint sour smell" and that he wore the same outfit on both occasions that he met with Wehrley (Tr. 177).

Hunt continues to point out that his statements to Wehrley coincide exactly with his testimony at the administrative hearing. Hunt on both occasions explained that he has a hard time understanding people and comprehending what they tell him, which has interfered with his ability to maintain employment in the past (Tr. 41-43, 45-46,175). Hunt made the same observations during the hearing - - that he had difficulty with verbal communication and with multitasking, that he had problems understanding what he was told (Tr. 41-43, 45-46). While Hunt did testify that he believed he could adjust to changes in the workplace, he conceded that his prior supervisors might feel differently about that subject (Id.). Hunt maintains that the ALJ found his testimony to be credible, yet the RFC includes no limitation for instructions to be written despite Hunt's admittedly credible testimony.

Hunt also challenges the exclusive reliance of the ALJ on the consultative examination reports prepared by Dr. Maryman (Tr. 288-294) and Dr. Gupta (Tr. 210-212). Hunt protests that the only basis offered by the ALJ for such reliance is that neither Dr. Maryman nor Dr. Gupta considered information provided by Hunt's father and stepmother (DN 12, p. 6). Yet, their information coincided exactly with Hunt's own hearing testimony, and with the results of objective psychological testing obtained by the other mental health professionals (Adam Brickler, Psy.D., Eva Markham, Ed.D. and Jack Teeple, Psy.D.). These other examiners, Hunt notes, all confirmed the longstanding problems with verbal communication and social interaction; the same problems that Hunts' parents repeatedly related in interview after interview. Drs. Gupta and Maryman, in contrast, focused only on Hunt's cognitive abilities, which according to Hunt are not in question as opposed to his inability to adequately process oral instructions, relate adequately to co-workers in the workplace, multitask and maintain basic hygiene. All of these problems, according to Hunt, are repeatedly confirmed by his history of failed employment, a history specifically confirmed by his parents, and by the statements of various employers as related in the vocational evaluation report prepared by Andrea Wehrley, which is nowhere mentioned in the hearing decision.

Hunt also takes issue with the ALJ's reliance on the absence of prescribed psychotropic medication or extended history of mental health treatment as a basis on which to diminish the nature of the marked limitations imposed by Hunt's developmental disorder. Hunt, as noted, was diagnosed with pervasive developmental disorder[1] by his treating doctor at the U of L

---

[1] Pervasive developmental disorder according to the National Institute of neurological Disorders and Stroke is a "group of disorders characterized by delays in the development of socialization and communication skills" that includes "problems with using and understanding language, difficulty relating to people ,objects and events … difficulty with changes in routine or familiar surroundings, and repetitive body movements or behavior patterns. Autism (a developmental brain disorder characterized by impaired social interaction and communication skills, and a limited range of activities and interests) is the most characteristic and best studied PDD . Other types of PDD include Asperger's Syndrome, childhood disintegrative disorder and Ret's Syndrome." According to the NINDS

Psychiatric Group, Dr. Steven Lippmann (Tr. 255-56). Dr. Lippmann prescribed cognitive behavioral therapy, which Hunt underwent with LCSW Cartwright (Tr. 253-254, 256, 268, 296-302). Accordingly, Hunt, while not prescribed medication, was prescribed treatment, cognitive behavioral therapy, which he participated in repeatedly. Further, Hunt notes that on at least one occasion he was hospitalized for psychiatric reasons when he experienced a severe panic attack in 2008, after being fired from his job at the Speedway gas station. This treatment history contradicts the findings of the ALJ, who does not indicate in his hearing decision what medications the ALJ would have expected Hunt to be prescribed to improve his developmental disorder symptoms, which were repeatedly noted by the consultative psychological examiners that the ALJ rejected without adequate explanation in Hunt's view merely because those examiners took into consideration statements by his parents - - statements confirmed by objective test results, independent diagnosis of his treating physician Dr. Lippmann, and by the observations of the same examiners, all of whom noted various aspects of Hunt's behavior and communication problems symptomatic of a developmental disorder such as autism or Asperberger's, both of which fall within the category of pervasive development disorders. Because the evidence of his disability is overwhelming, and because the ALJ's decision is not supported by substantial evidence and is contrary to the record read as a whole, Hunt requests the Court to reverse the decision of the Commissioner and remand with instructions that benefits be paid (DN 12, pp. 13-14).

The Commissioner responds that the ALJ properly determined Hunt's RFC in finding of fact no. 5 to include the remaining capacity to perform a modified range of medium work (DN 15, p. 5). Substantial evidence in the Commissioner's view supports this determination,

"there is no known cure for PDD." See http://www.nimds.nih.gov/disorders/pdd/pdd.htm (last visited May 15, 2014).

including the opinions of both consultative examiners, Drs. Gupta and Maryman, along with those of the reviewing experts, Jane Brake, Ph.D., Timothy Greg, M.D., and Larry Freudenberger, Psy.D. (Tr. 64-74 80-90, 212, 220-22, 291-95). The Commissioner in his fact and law summary does concede that the ALJ failed to discuss the vocational report (Tr. 174-87) of Andrea Wehrley in his hearing decision (DN 15, p. 6). The Commissioner insists, however, that the omission of any mention of Wherley's evaluation report is at worst a harmless error. This is so, according to the Commissioner, because the ALJ considered Hunt's condition as a whole, a and the RFC determination contained in finding no 5 was in any event generally consistent with the opinion of Wehrley would "perform best in a highly structured, somewhat challenging position in which he works independently or with very minimal interpersonal interaction." (Tr. 24-25, 186). Alternatively, the Commissioner contends that even if the opinions of vocational evaluator Wehrley are inconsistent with the RFC determination of the ALJ, Wehrley's opinion is not entitled to any special weight or deference given that as a career services counselor Wehrley is not an acceptable medical source, such as a licensed physician, psychologist, optometrist, podiatrist or speech pathologist. See 20 C.F.R. §§ 404.1513(a)(1)-(5), 416.913(a)(1)-(5). *See Walters v. Comm'r*, 127 F.3d 525, 530-31 (6th Cir. 1997).

The Commissioner continues in her fact and law summary to note that the opinion of vocational evaluator Wehrley insofar as it runs to the ability of Hunt to obtain employment is itself an issue that falls within the exclusive province of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p, 1996 WL 374183 at *2. *See Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007). The Commissioner consequently concludes that the admitted failure of the ALJ to make any mention of the vocational evaluation report was at most harmless error in that Hunt was not deprived of any substantial procedural right, and the decision of the ALJ was not materially affected. *See Rabbers v. Comm'r*, 582 F.3d 647, 654-58 (6th Cir. 2009).

The Commissioner disputes Hunt's argument that the ALJ failed to adequately explain his decision to afford significant weight to the opinions of consultative psychological examiners Dr. Gupta and Dr. Maryman (DN 15, p. 8). The ALJ in the Commissioner's view properly based his opinion on the fact that both doctors based their opinions on Hunt's own responses upon examination rather than the statements of Hunt's family members, as well as the fact that the opinions of Drs. Gupta and Maryman were consistent with one another. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (an opinion that is more consistent with the record as a whole may properly be afforded more weight). Further, the Commissioner points out that Hunt's arguments in this regard essentially ask the Court to re-weigh the opinions of the various consultative examiners, which is not an appropriate task for the Court. *See Mullins v. Sec'y of HHS*, 836 F.2d 980, 984 (6th Cir. 1987). So long as substantial evidence in the record supports the decision of the ALJ, the fact that there also may be substantial evidence in the record to support a determination of disability is not determinative and does not require the Court to set aside the decision of the Commissioner. *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). The Commissioner reasons that ALJ Pickett properly afforded less weight to the opinions of Drs. Brickler, Teeple and Markham as the opinions of these consultants were inconsistent with evidence of record, were insufficiently supported by findings on clinical examination, and relied to their detriment on the subjective reports of Hunt's father and stepmother (Tr. 29). *See Walters v. Comm'r*, 127 F.3d 525, 530 (6th Cir. 1997).

The Commissioner also asserts that substantial evidence supports the credibility finding of ALJ Pickett in his hearing decision (Tr. 26-28). For example, the Commissioner notes that despite the report of Hunt's father that his son's mental difficulties began in early childhood, the medical records reveal that Hunt did not begin to seek mental health treatment until June of 2011, a delay in treatment that may properly be considered under 20 C.F.R. §404.1529(c)(v),

416.929(c)(v).  *See White v. Comm'r*, 572 F.3d 272, 2834 (6th Cir. 2009) (lack of mental health

treatment, while not conclusive, can properly be construed to indicate alleviation of a claimant's

symptoms); *Blacha v. Sec'y of HHS*, 927 F.2d 228, 231 (6th Cir. 1990) (failure of the claimant to

seek treatment undermined his claim of disabling symptoms).  The Commissioner also notes that

Hunt was able to work successfully for many years, that he reported to Dr. Gupta that his social

interaction with friends and family was "okay" and that "he though he always got along pretty

well with others," that both Dr. Gupta and Dr. Maryman observed Hunt to be adequately

groomed and otherwise appropriately attired, despite his family's claims to the contrary (Tr. 141,

211, 215, 288).  Hunt himself, the Commissioner notes, reported to Dr. Lippmann that he

believed he remained able to work; he also expressed the opinion that his stepmother was

"forcing" disability upon him (Tr. 253, 271).  Also, while Hunt's father and stepmother provided

information suggestive of more severe non-exertional limitations in the workplace, the

Commissioner points out that Dr. Maryman noted in his report that Hunt did not spend much

time with his father and stepmother, thereby limiting their ability to adequately observe him (Tr.

28, 290).  Accordingly, the Commissioner concludes that the ALJ properly found based on

substantial evidence that Hunt despite his non-exertional impairments retained the residual

functional capacity to perform a limited range of medium work with the non-exertional

limitations set forth in finding of fact no. 5.  Because the hypothetical question to the vocational

expert at the hearing properly included those limitations found by ALJ Pickett and because the

V.E. identified a substantial number of jobs in that Hunt remained capable of performing with

such limitations (hand packager, laundry worker and janitorial cleaner), the Commissioner

ultimately concludes that she met her burden at step 5 of the sequential evaluation process to

show that Hunt can perform other work that exists in the national economy.  See 20 C.F.R. §§

404.1520(a)(4)(v), (g); 416.920(a)(4)(v)(g).  *See Casey v. Sec;y of HHS*, 980 F.2d 1230, 1235 (6th Cir. 1993); *Maziarz v. Sec'y of HHS*, 837 F.2d 240, 247 (6th Cir. 1987).

The Court has carefully considered the arguments offered by Hunt and the Commissioner.  No question exists that the hearing decision of ALJ Pickett fails to include any reference to the Nov. 12, 2010 vocational evaluation report prepared by evaluator Andrea Wehrley of the Jewish Family and Career Services Division (Tr. 174-187).  The Commissioner in her fact and law summary concedes as much (DN 15, p. 6).  The Court's own review of the decision confirms this error which contravenes the fundamental rule that an ALJ must consider all of the evidence of record when making a disability determination.  *See Gentry v. Comm'r*, 741 F.3d 708, 723 (6th Cir. 2014) ("An ALJ is bound to adhere to certain governing standards when assessing the medical evidence in support of a disability claim.  Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination….") (citing *Wilson v. Comm'r*, 378 F.3d 541, 545 (6th Cir. 2004)).  See also, 20 C.F.R. §§404.1520(a)(3); 20 C.F.R. §404.1512(b); 20 C.F.R. §404.1513.  In fact, the Commissioner in her fact and law summary cites the applicable rule, SSR 06-03p, 2006 WL 2329939 at *4, which clearly states that opinions from nonacceptable medical sources such as the vocational evaluation prepared by Wehrley should be considered along with all available evidence of record (DN 15, p. 6).  Accordingly, this failure to comply with the administration's own rule will warrant a remand unless it is found to be harmless error.  *Wilson*, 378 F.3d at 545-46 ("It is an elemental principle of administrative law that agencies are bound to follow their own regulations.") (citing *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959)).

The federal courts will generally review all decisions of administrative agencies for harmless error.  *Heston v. Comm'r*, 245 F.3d 528, 535 (6th Cir. 2001).  An error of an agency that results in prejudice to a claimant on the merits or deprives the claimant of substantial rights will

not be considered to be "harmless."  *Rabbers v. Comm'r*, 582 F.3d 647, 654-55 (6th Cir. 2009)

(citing *Connor v. United States Civil Service Commission*, 721 F.2d 1054, 1056 (6th Cir. 1983)).

*See gen., Amer. Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539 (1970) (The failure

of an agency to follow its own regulations will not require reversal absent a showing of

substantial prejudice by the affected party).  *See gen., Morton v. Ruiz*, 415 U.S. 199, 235 (1974)

("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own

procedures.").  When an error by a federal agency affects the substantial rights of an individual

such as a claimant for disability insurance benefits, the mere possibility that a reviewing court

might be able to hypothesize that an ALJ *could have* found a claimant to be not disabled based

on substantial evidence is not sufficient to conclude that an otherwise prejudicial error is a

harmless one.  *See M.G. v. Comm'r*, 861 F. Supp.2d 846, 860-61 (E.D. Mich. 2012).  In this

regard, our sister district for the Eastern District of Michigan explained the matter well in *M.B. v.

Comm'r*, 861 F. Supp.2d at 860-61, wherein the court writes:

> The Commissioner interprets *Rabbers* to require reviewing courts to
> affirm the ALJ's conclusion so long as it is supported by substantial
> evidence….  Yet *Rabbers* specifically held that an ALJ's decision will be
> reversed when it prejudices the claimant on the merits "even if supported
> by substantial evidence."  *Rabbers*, 582 F.3d at 651 (emphasis added)….
> [T]o read *Rabbers* as the Commissioner proposes would immunize an
> ALJ's decision from review whenever the ALJ *could have* found on the
> record that the claimant was not disabled.  Instead *Rabbers* hold that an
> error is harmless only when "concrete factual and medical evidence" is
> "apparent from the record" and shows that even if the ALJ had made the
> required findings, the ALJ *would have* found the claimant not disabled….
> This is no trivial distinction, but goes to the very heart of administrative
> adjudication.  If the reviewing court were permitted to affirm any outcome
> that could have been supported by the evidence, it would propel the court
> into the domain which Congress has set aside exclusively for the
> administrative agency.
>
> ….
>
> A reviewing court must "exercise caution" when undertaking this inquiry.
> As the *Rabbers* court warned, it may be difficult or impossible to

> determine whether an error is harmless when the record contains
> "conflicting or inconclusive evidence" not resolved by the ALJ or
> "evidence favorable to the claimant that the ALJ simply failed to
> acknowledge or consider." *Rabbers*, 582 F.3d at 657-68. In such cases,
> the court is unable to review the ALJ's decision, and is instead left to
> speculate as to how the ALJ might have waived that evidence.

*Id* (quoting *Juarez v. Astrue*, Case No. 2:09-CV-160, 2010 WL 743739 at *5-6 (E.D. Tenn. Mar. 1, 2010) (come internal citations, quotations and alterations omitted). *See also, Marok v. Astrue*, Case no. 5:08-CV-1832, 2010 WL 2294056 at *8-9 (N.D. Ohio June 3, 2010) ([C]ourts apply a harmless error analysis cautiously, taking care to avoid rewriting an ALJ's decision post-hac even when substantial evidence exists to support the ALJ's decision").

The above quotation from the *Juarez* decision, as incorporated in *M.G. v. Comm'r*, *supra*, aptly summarizes the dilemma that this Court now faces. We do not sit to make findings of fact in Social Security disability cases, but rather to review the adequacy of findings made. The decision of ALJ Pickett contains no findings with respect to the vocational evaluation report at issue. The report in the Court's view is not inconsequential, but rather is highly significant, if not determinative, to a proper evaluation of Hunt's disability claim for a number of important reasons. First, the report is not a vague, nonspecific or abbreviated document. Rather, it is based upon multiple interviews and a series of vocational diagnostic testing by evaluator Wehrley. The report therefore cannot be dismissed offhand.

Second, the vocational evaluation report contains both observations and test results that are strongly supportive of the arguments raised by Hunt in his fact and law summary, as well as his claim for disability. For example, the interview with Hunt's father and stepmother contains repeated examples of employment-related problems caused by Hunt's pervasive developmental disorder symptoms, as related by Hunt's own employers to his stepmother (Tr. 175). In other words, the very behavioral problems that Hunt maintains were not appropriately considered by

31

the ALJ are reflected in Wehrley's vocational evaluation report from Hunt's own employers. The report confirms that Hunt's persistent hygiene problems, difficulty with socialization and inability to multitask - - all of which are referred to both by Hunt and consultative examiners Brickler (Tr. 213-218), Teeple (Tr. 238-241) and Markham (Tr. 248-252) - - were offered by Hunt's own employers as the reason for his discharge from both McDonald's and Speedway (Tr. 175). Both of these employers indicated to Hunt's stepmother that his hygiene was a major complaint and that Hunt could not multitask, even when given the simplest jobs available (Id.). While such information from Hunt's employers might not be held to be determinative by the Commissioner, it is at a minimum entitled to adequate consideration, of which the present hearing decision gives no indication.

Third, Wehrley's vocational evaluation report contained the evaluator's own observations, which also tend to strongly corroborate the statements of Hunt's parents. Wehrley noted that on both occasions that Hunt appeared for evaluation he wore the exact same outfit (Tr. 177). Further, Wehrley noted that Hunt exuded "a faint sour smell similar to the smell of clothes that have been sitting in water for too long." (Id.). These observations, as noted, tend to directly corroborate the persistent hygiene problems that were related not only by Hunt's parents but by his employers, as well. Although the ALJ in his hearing decision tended to discount such hygiene-related complaints, the unmentioned vocational evaluation report is strongly supportive of Hunt's claim that his developmental disorder symptoms directly interfered with his ability to obtain and sustain employment.

Fourth, Wehrley's observations of Hunt's behavior during the interviews she conducted also reinforces Hunt's arguments that his nonexertional, developmental disorder symptoms, such as his difficulties in communication and socialization, were not adequately taken into consideration in determining his RFC in finding of fact no. 5. Wehrley noted in her report that

Hunt did not make eye contact either with his parents or with Wehrley during either of the interviews she conducted as part of the evaluation process (Tr. 177). Hunt instead "kept his eyes downcast, focusing his attention on the floor." (Id.). He was noted to "stare past people or to look away from them altogether." (Id.). During the conversation concerning the reasons that Hunt was fired from employment at McDonald's and Speedway, Hunt became defensive and argumentative "and did not seem to take ownership of his actions." (Id.). Wehrley noted in her report that Hunt had a "tendency to ramble on about a particular topic and lose sight of the original subject." (Id.). His thought process was observed to be "incongruent and tangential" and "he seemed to have difficulty making cause and effect connections." (Id.). More specifically, Hunt had "difficulty … in explaining why he couldn't hold onto a job." (Id.). All of these observations again appear to be strongly supportive of Hunt's position that the symptoms of his pervasive developmental disorder substantially interfere with his ability to engage in substantial gainful activity. As Wehrley notes in her report, "According to his past employers his main problem areas include" hygiene, multitasking, being argumentative and following directions" with social interaction and understanding verbal information also being noted to be "concerns." (Tr. 185). Because appropriate consideration of Wehrley's report, her observations and vocational test results may well have affected the outcome of Hunt's disability application, the Court is compelled to remand the matter, and will not succumb to the risk of becoming a finder of fact with regard to the vocational evaluation report.

The arguments of the Commissioner with regard to the report do not persuade the Court otherwise. The Commissioner maintains correctly that Wehrley is not considered to be an acceptable medical source. That is completely true but beside the point. As even the Commissioner notes, the ALJ is required to consider even nonacceptable medical sources in determining a claimant's application for disability benefits (DN 15, p. 6). The Commissioner

also points out, again correctly, that the determination of whether a claimant remains capable of substantial gainful employment given his or her severe impairments and the resulting limitations is a matter reserved exclusively to the Commissioner (Id.). This point also is an accurate one, as well. The question, however, is not whether the omitted vocational evaluation report is of itself determinative of the outcome, but rather when appropriately taken into consideration by the ALJ, its inclusion would have had a substantial effect on the possible outcome of the administrative proceedings. The Court concludes that this is so and therefore must remand the matter to the Commissioner, who is charged with weighing the evidence and making findings supported by substantial evidence.

The Court in reaching its determination that this matter must be remanded for further consideration takes into account several concerns that materially affect its decision. These concerns arise from the manner in which the ALJ has reviewed the evidence in this case. That review appears to the Court to be highly selective, and in certain instances, unsupported by the record. For example, the ALJ in finding of fact no. 3 at p. 3 of the hearing decision states that "there is little agreement or consistency between the evaluators and the medical sources regarding what exact diagnosis the claimant should be assigned." (Tr. 22). Later in the body of the opinion at p. 7 in finding of fact no. 5, the ALJ similarly states that "as discussed above, the evidence of record contains a plethora of psychiatric diagnoses, with little agreement between the providers of the proper diagnoses of the claimant (Tr. 26) (citing Exhibits 1F, 2F, 5F, 7F, 9F and 13F). These observations in the Court's mind are deficient in at least two respects. First, while the diagnoses of the various psychological consultants are not per se identical, they all involve to the Court's reckoning, aspects of pervasive developmental disorder. In other words, the diagnosis of Asperger's and autism are merely variants of a pervasive development disorder, rather than inconsistent or conflicting diagnoses. Thus, the fact that Hunt was diagnosed with

34

Asperger's or autism by various consultative psychological examiners is not indicative of "little agreement between providers over the proper diagnosis," but rather appears to be indicative of the difficulty in arriving at a specific diagnosis within the autism spectrum of pervasive personality disorder. In making this initial observation, the Court does not intend to overstep its bounds to independently evaluate the evidence, but rather to highlight the importance of proper consideration of the vocational evaluation report upon remand.

The second problem with the quoted portions of the hearing decision set forth above is that nowhere in the hearing decision is there substantial mention of the nature of the behaviors that led to the supposedly inconsistent diagnoses. The contents of the reports of consultative examiners Brickler, Teeple and Markham reveal and confirm the type of functional limitations arising from Hunt's persistent developmental disorder, a diagnosis rendered by Hunt's treating physician, and therefore one not to be lightly dismissed under the treating source rule. In other words, Hunt displayed to the above-cited mental health professionals classic behaviors of the disorder such as limited insight, poor judgment, and inappropriate responses. To the extent that the ALJ appeared to consider these symptoms and their resulting functional limitations, the ALJ dismissed all of the observations and results of Brickler, Teeple and Markham apparently because Hunt's parents were involved in providing information to the evaluator (Tr. 26-28). Apparently, the ALJ concluded that Hunt's father and stepmother did not have sufficient contact with him, despite weekly interaction over more than a decade, to meaningfully assist in providing information concerning his non-exertional limitations caused by his developmental disorder. This reasoning is suspect in the Court's view, and serves to underscore the need for remand for further consideration of the vocational evaluation report. Assuming that Hunt's parents had only weekly contact with him since his return to Louisville in 2001, such weekly contact over the span of a decade would at a minimum suggest 520 days of contact with Hunt to

35

observe his behaviors, behaviors that Hunt's father had observed since his early developmental years. Further, it should be noted that Hunt resided for a time in the basement of his sister and brother-in-law's home, where his behaviors also were observed so that the ALJ's reasoning that insufficient contact undermined the observations of Hunt's parents is problematic at best.

Hunt's parents, logic would suggest, were far more objective in their observations that Hunt himself. Hunt was noted repeatedly to have limited insight and judgment, to minimize his problems, and to have an inadequate grasp of his limitations. Hunt would therefore seem to be less able to provide an adequate self-assessment than outside observers such as family members unaffected by the symptoms of persistent developmental disorder. If so, then the ALJ's reliance upon the psychological consultative reports obtained by Drs. Gupta and Maryman is also called into question. The ALJ specifically chose to provide more weight to the reports of Drs. Gupta and Maryman because Hunt alone had provided them with information. Yet, Hunt, as noted above, repeatedly exhibited limited insight and judgment into his own developmental disorder so that he would seem to be far from the best source, as opposed to his father and stepmother. Put differently, the conclusions of those consultative psychological examiners who relied in part upon the statements and observations of Hunt's parents logically would seem to be more likely to be accurate than those of the consultative psychological examiners who relied solely upon Hunt's own statements. The Court makes no finding in this respect, but again makes this observation to underscore the importance of remand given the nature of the record and the substantial concerns of the Court.

In this latter respect, the Court notes that the reliance upon the ALJ of Hunt's lack of treatment or psychotropic medication also raises issues that require consideration, as well. Certainly, a lack of mental health treatment, or the absence of psychotropic medication, may in appropriate cases be indicative of a less than severe mental impairment, or a mental impairment

with less severe functional limitations.  Hunt's case, however, presents additional considerations in that Hunt's pervasive developmental disorder, which Hunt's father noted appeared early on, did not appear to affect Hunt's academic success.  In other words, Hunt was able to function adequately in an academic environment so that a failure to seek treatment at that point would not seem to the Court to be per se indicative of a non-severe impairment or a severe impairment with minimal functional limitations in the workplace, as opposed to the schoolroom, where Hunt was able to function.  Of course, matters appear to the Court to have changed dramatically once Hunt was no longer able to obtain employment as an independent contractor, working alone, but was compelled to attempt to work cooperatively with others and the public, at which time the nature of his pervasive development disorder symptoms became more apparent and intrusive on his ability to obtain and sustain employment.  At that point, a decision to seek treatment would be understandable, as opposed to earlier on when Hunt still was able to succeed academically.

The absence of psychotropic medication also would not appear to the Court to be necessarily an automatic indication of the non-severe nature of Hunt's non-assertional impairment, or the severity of any functional limitations therefrom.  As Hunt points out, the ALJ does not suggest nor does the record indicate that a pervasive developmental disorder, or Asperger's or autism, can be effectively treated with medication.  Certainly, no treating source in the record ever recommended medication, which Hunt declined to take.  To the contrary, Dr. Lippmann prescribed cognitive behavioral therapy.  Hunt underwent cognitive behavioral therapy with LCSW Cartwright in accordance with his doctor's prescription for treatment.  Consequently, the fact that no psychotropic medication was prescribed to Hunt would seem to the Court to have little weight in the determination of the extent, persistence and debilitating effect of Hunt's mental impairment.

All of these concerns merely serve in the Court's view to underscore the need for remand so that the ALJ can fulfill its function as a fact finder and comply with the regulations to consider the entire record. The Court cannot say that the failure to consider the vocational evaluation report had no effect on the substantial rights of Hunt. Rather, the Court concludes otherwise. The content of the vocational evaluation report, as discussed above, would seem to the Court to weigh directly on the outcome of Hunt's disability application. While it might be possible to hypothesize substantial evidence that would support the denial of Hunt's application, that is not the standard for harmless error analysis. The Court will not become fact finder in derogation of its appropriate role. Accordingly, pursuant to sentence 4 of 42 U.S.C. §405(g), the decision of the Commissioner is **VACATED** and the case **REMANDED** so that the entire record including the vocational evaluation report of Angela Wehrley may be appropriately considered in light of the above concerns discussed by the Court.

Cc:     Counsel of Record